UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSULTANTS IN PROCUREMENT INC., and JAMES WILLIAMS, <br><br> Plaintiffs, <br><br> - against – <br><br> DIVERSE CAPITAL, LLC, HI BAR CAPITAL, LLC, AMAL CAPITAL CORP., EESHAN CAPITAL CORP., AJ ADVANCE, INC., MMHKK, INC. (D/B/A KINGDOM KAPITAL), DAVID RABI, YOEL GETTER, ARIEL PERETZ, JONATHAN ALLAYEV, and YOSEF BREZEL, <br><br> Defendants. | Case No.: <br><br><br><br><br> COMPLAINT |

Plaintiffs Consultants in Procurement Inc. and James Williams (jointly, "Plaintiffs"), by their attorneys, Robinson Brog Leinwand Greene Genovese & Gluck P.C., as and for their Complaint against defendants Diverse Capital, LLC, Hi Bar Capital, LLC, Amal Capital Corp., Eeshan Capital Corp., AJ Advance, Inc., MMHKK, Inc. (d/b/a Kingdom Kapital), David Rabi, Yoel Getter, Ariel Peretz, Jonathan Allayev, and Yosef Brezel (collectively, "Defendants"), allege as follows:

### The Parties

1.    Plaintiff Consultants in Procurement Inc. ("CIP") is a Texas corporation with a principal address of 1824 8th Avenue, Fort Worth, Texas, 76110.

2.    Plaintiff James Williams ("Williams") is an individual residing in Texas.

3.    Williams is the majority shareholder of CIP.

4.      Defendant Diverse Capital, LLC ("Diverse Capital") is a Connecticut limited liability company with a principal address of 750 Main Street, Suite 906, Hartford, Connecticut, 06103.

5.      Defendant Hi Bar Capital, LLC ("Hi Bar Capital") is a New York limited liability company with a principal address of 1825 65th Street, Suite 300, Brooklyn, New York, 11204.

6.      Defendant MMHKK, Inc. (d/b/a Kingdom Kapital) ("Kingdom Kapital") is a New York corporation with a principal address of 2922 Avenue L, 2nd Floor, Brooklyn, New York, 11210.

7.      Defendant Ariel Peretz is an individual that, upon information and belief, resides at 400 East 71st Street, Apt. 4L, New York, New York, 10021.

8.      Defendant Amal Capital Corp. ("Amal Capital") is a New York corporation with a principal address of 1769 East 22nd Street, Brooklyn, New York, 11229.

9.      Upon information and belief, Amal Capital is owned and controlled by Ariel Peretz.

10.      Defendant Jonathan Allayev is an individual that, upon information and belief, resides at 6260 108th Street, Apt. 4B, Forest Hills, New York, 11375.

11.      Defendant AJ Advance, Inc. ("AJ Advance") is a Florida corporation with a principal address of 17121 Collins Avenue, Apt 1806, Sunny Isles Beach, Florida, 33160.

12.      Upon information and belief, AJ Advance is owned and controlled by Jonathan Allayev.

13.     Defendant, Yoel Getter (aka Joel Geta) is an individual that, upon information and belief, resides at 564 East 9th Street, Brooklyn, New York, 11218.

14.     Defendant, David Rabi is an individual that, upon information and belief, resides at 1326 East 5th Street, Brooklyn, New York, 11230.

15.     Defendant Eeshan Capital Corp. ("Eeshan Capital") is a New York corporation with a principal address of 600 Old Country Road, Room 300, Garden City, New York, 11530.

16.     Upon information and belief, Eeshan Capital is owned and controlled by Yoel Getter.

17.     Defendant Yosef Brezel is, upon information and belief, an individual residing at 1009 East 2nd Street, Brooklyn, New York, 11230.

## Jurisdiction and Venue

18.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961, arise under the Constitution, laws, or treaties of the United States.

19.     This Court has subject-matter jurisdiction over Plaintiffs' state-law claims because those claims are so related to the federal claims asserted herein that they form part of the same case or controversy under Article III of the United States Constitution.

20.     This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(l) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 139l(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in the District.

22.     Each of the Defendants is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself to the jurisdiction of this Court, regularly transacts business within the State of New York, and/or has purposefully availed itself/himself of the jurisdiction of this Court with respect to the specific transactions at issue.

### Aiding and Abetting and Concerted Action

23.     In committing the wrongful acts challenged in this Complaint, Defendants have pursued or joined in the pursuit of a common course of action and have acted in concert with one another in furtherance of their common plan or design.  In addition to the wrongful conduct giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

24.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrong as detailed herein.   In taking such actions to substantially assist in the commission of the wrongdoing detailed herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### Facts Common to All Counts

*Defendants' Business Model*

25.     Defendants are participants in a criminal enterprise that profits by making and collecting on illegal loans.

26.     Defendants target and prey upon small businesses who are unable to quickly obtain conventional funding from banks and traditional lenders.

27.     In desperate need of cash to keep their businesses afloat, small business owners succumb to Defendants' misrepresentations, high-pressure sales tactics, and false promises of readily available, short-term funding.

28.     Defendants seek to evade usury laws by disguising their illegal loans as "merchant cash advances" where Defendants purchase a merchant's accounts receivable at an extreme discount.

29.     In reality, the cash advances that Defendants make to merchants are criminally usurious loans that are in no way tied to the merchants' accounts receivable and must be repaid on a fixed schedule regardless of the merchants' income during the repayment period.

30.     To induce merchants to enter into illegal loan agreements, Defendants routinely make knowingly false and misleading statements.

31.     The website maintained by Diverse Capital includes the following false statements:

> You do not have to put any company or personal assets as collateral to get quick cash for your business. And when you don't put any asset as collateral, you do not run the risk of losing it. With a business cash advance you only pay a portion of the sales that your business makes.

32.     The website maintained by Kingdom Kapital includes the following false statements:

> Repayments are done based on your daily sales. If your sales are low, your repayment is lower. When your sales increase you will payback faster.

33.     To conceal his true identity from merchants, defendant Yoel Getter uses the name  Joel Geta.

**The June 1 Agreement**

34.     On or about June 1, 2021, CIP and defendant Diverse Capital entered into a Merchant Agreement ("the June 1 Agreement") whereby Diverse Capital agreed to loan CIP $150,000, less $17,500 in fees.

35.     Repayment of the $150,000 loan to CIP was secured by, *inter alia*, a personal guarantee signed by Williams.

36.     In exchange for receiving the $150,000 loan pursuant to the June 1 Agreement, CIP agreed to pay Diverse Capital $224,850 via a series of $3,748 payments.   More specifically, Diverse Capital was authorized to debit $3,748 directly from CIP's account on every business day until the loan was repaid.

37.     The $17,500 in fees paid by CIP pursuant to the June 1 Agreement (a) does not reflect any specific costs incurred by Diverse Capital; (b) is simply an additional source of profit for Diverse Capital; and (c) constitutes additional interest charged to CIP.

38.     If the $17,500 in fees paid by CIP is considered interest, the June 1 Agreement required CIP to repay the $150,000 loan with interest at a rate of approximately 240 percent per annum.

39.     If the $17,500 in fees paid by CIP is not considered interest, the June 1 Agreement required CIP to repay the $150,000 loan with interest at a rate of approximately 215 percent per annum.

**The Refi Agreement**

40.     On or about June 16, 2021, CIP and Diverse Capital entered into a second Merchant Agreement ("the Refi Agreement") whereby Diverse Capital agreed to loan CIP $350,000, less $13,890 in fees.

41.     $206,110 of the $350,000 loan made pursuant to the Refi Agreement was used to pay the balance purportedly owed from CIP to Diverse Capital under the June 1 Agreement.

42.     Repayment of the $350,000 loan to CIP was secured by, *inter alia*, a personal guarantee signed by Williams.

43.     In exchange for receiving the $350,000 loan pursuant to the Refi Agreement, CIP agreed to pay Diverse Capital $524,650 via a series of $17,488.33 payments.   More specifically, Diverse Capital was authorized to debit $17,488.33 from CIP's account on every business day until the new loan was repaid.

44.     The $13,890 in fees paid by CIP pursuant to the Refi Agreement (a) does not reflect any specific costs incurred by Diverse Capital; (b) is simply an additional source of profit for Diverse Capital; and (c) constitutes additional interest charged to CIP.

45.     If the $13,890 in fees paid by CIP is considered interest, the Refi Agreement required CIP to repay the $350,000 loan with interest at a rate of approximately 450 percent per annum.

46.     If the $13,890 in fees paid by CIP is not considered interest, the Refi Agreement required CIP to repay the $350,000 loan with interest at a rate of approximately 430 percent per annum.

**The Settlement**

47.     After signing the Refi Agreement, CIP (a) objected to the validity and legality of the Refi Agreement; and (b) returned the $130,000 in loan proceeds it had received from Diverse Capital pursuant to the Refi Agreement.

48.     Although CIP returned the $130,000 in loan proceeds it received pursuant to the Refi Agreement, Diverse Capital continued to withdraw $17,488.33 from CIP's account on each business day.

49.     On or about June 25, 2021, Plaintiffs and Diverse Capital entered into a settlement agreement ("the Settlement") whereby Diverse Capital agreed to accept a one-time payment of $255,000 ("the Settlement Amount") as full and final satisfaction of Plaintiffs' obligations under the Refi Agreement.

50.      Diverse Capital instructed Plaintiffs to pay $140,000 of the Settlement Amount to Hi Bar Capital.

51.     Another $105,000 of the Settlement Amount was paid to Kingdom Kapital.

52.     Plaintiffs complied with the terms of the Settlement.

53.     In all, Plaintiffs paid Diverse Capital $494,000.19 in connection with the Refi Agreement.

### First Claim for Relief
### (RICO - 18 U.S.C. § 1962)

54.     Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above, as if fully set forth herein.

55.     Defendants are separate individuals or entities that, by virtue of one or more contracts or agreements, are associated with each other for the purpose of originating, underwriting, servicing, and collecting usurious loans throughout the United States.

56.     Defendants' association constitutes a single association-in-fact enterprise (the "Lending Enterprise") within the meaning of 18 U.S.C. § 1962(c), as the term is defined in 18 U.S.C. § 1961(4).

57.     The Lending Enterprise engages in illegal activity by entering into illegal financing agreements and attempting to collect unlawful debts.

58.     The Lending Enterprise has an existence separate and apart from its illegal activity.

59.     Each of the Defendants has a distinct role in the Lending Enterprise.

60.     Upon information and belief, defendant Yosef Brezel provides the money that defendants Diverse Capital, Hi Bar Capital, and Kingdom Kapital use to make illegal loans.

61.     Upon information and belief, Amal Capital Corp., Eeshan Capital Corp., AJ Advance, Inc., Yoel Getter, Ariel Peretz, David Rabi, and Jonathan Allayev service and collect the illegal loans on behalf of the Lending Enterprise and exercise managerial authority over the Lending Enterprise.

62.     The Lending Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

63.     Members of the Lending Enterprise maintain offices in New York and use personnel in those offices to originate, underwrite, fund, service and collect on illegal loans made to borrowers in Texas and throughout the United States.  In doing so, those members

of the Lending Enterprise make extensive use of interstate emails, telephone calls, wire transfers and electronic bank withdrawals.

64.     All communications between the Lending Enterprise and Plaintiffs were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Lending Enterprise used interstate emails and telephone calls to (a) originate, underwrite, service and collect upon the illegal loans made to CIP; (b) fund the illegal loans made to CIP; and (c) collect amounts due from CIP pursuant to the June 1 Agreement and the Refi Agreement.

65.     The obligations imposed on CIP pursuant to the June 1 Agreement and the Refi Agreement constitute unlawful debts within the meaning of 18 U.S.C. 1962(c) because the loans made pursuant to those agreements (a) violate applicable criminal usury statutes, and (b) charge interest at rates more than twice the rate allowable by law.

66.     Defendants participated in the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though the collection of an unlawful debt in violation of 18 U.S.C. l 962(c).

67.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, and agreed together to collect an unlawful debt in violation of 18 U.S.C. § 1962(d).

68.     By and through their collective business relationships, and their close coordination with respect to underwriting, funding, servicing, and collecting on unlawful loans, each of the Defendants knew the nature of the Lending Enterprise and knew that the Lending Enterprise extended beyond each of the Defendant's specific role in the Lending Enterprise.

69. Through their connections and coordination, each of the Defendants combined to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means.

70. Defendants acted maliciously, without legal justification, and with the intent of injuring Plaintiffs.

71. Defendants have engaged in a civil conspiracy.

72. In the course of their civil conspiracy, Defendants committed one or more unlawful, overt acts.

73. Each of the Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Lending Enterprise's affairs in order to collect unlawful debts, including pursuant to the June 1 Agreement and the Refi Agreement, in violation of 18 U.S.C. § 1962(c).

74. Each of the Defendant was a knowing, willing, and active participant in the Lending Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon the unlawful debts at issue.

75. The participation and agreement of each of the Defendants was necessary to perpetrate their scheme to solicit, underwrite, fund, and collect upon the unlawful debts.

76. Plaintiff have been and will continue to be injured in their business and property by reason of the Defendants violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

77.     The injuries to Plaintiffs include, but are not limited to, tens of thousands of dollars in improperly collected interest and fees, plus attorneys' fees and costs associated with exposing Defendants' misconduct.

78.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees.

### Second Claim for Relief
### (Declaratory Judgment)

79.     Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above, as if fully set forth herein.

80.     By reason of the actions of Defendants as described above, Plaintiffs entered into the Settlement and paid Defendants $255,000.  Plaintiffs did so only because they had no other reasonable economic alternative, and despite the fact that the June 1 Agreement and Refi Agreement contain unreasonable, onerous and draconian terms, and are illegal as a matter of law.

81.     The terms of the June 1 Agreement and the Refi Agreement are illegal loans and are unenforceable.

82.     The consideration provided by Defendants to induce Plaintiffs to enter into the Settlement was illusory.  Plaintiffs, in fact, received no consideration from Defendants.

83.     There is an actual and justifiable controversy between Plaintiffs and Defendants with respect to the validity of the Settlement and as to whether Plaintiffs are entitled to the return of the $255,000 paid to Defendants pursuant to the Settlement.

84.     Plaintiffs seek a declaration of their legal rights.  Specifically, Plaintiffs seek a declaration that the Settlement is void *ab inito* and, as a result, Plaintiffs are entitled to the return of the $255,000 paid to Defendants pursuant to the Settlement.

**WHEREFORE**, Plaintiffs demand judgment against Defendants

Dated:  New York, New York
          July 15, 2021

                                        ROBINSON  BROG  LEINWAND  GREENE
                                        GENOVESE & GLUCK P.C.
                                        *Attorneys for Plaintiffs*


                                        By:    /s/ Matthew Cono Capozzoli
                                                Matthew Cono Capozzoli